**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADAM FISCHER, individually and on behalf of all others similarly situated, <br><br>                         Plaintiff, <br><br>           v. <br><br> AMERICAN AIRLINES, INC., and JOHN DOES 1-10. <br><br>                    Defendants. | Case No. 1:25-cv-05289 <br><br> **CLASS ACTION COMPLAINT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

Dated: September 19, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Caroline C. Donovan
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
       cdonovan@bursor.com

*Attorneys for Plaintiff*

i

## TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................2

PARTIES .................................................................................................................6

CLASS ALLEGATIONS ...........................................................................................8

    I.      THE PLAN ................................................................................. 8

    II.    DEFENDANTS FAILED TO UPHOLD THEIR FIDUCIARY DUTIES REGARDING THE RKAS................................................................. 12

        A.    Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants Like the Plan Here......................... 13

        B.    ERISA's Fee Disclosure Rule ................................................. 16

        C.    Much Information Regarding the Reasonableness of Fees for Recordkeeping Services is in the Sole Possession of Defendant ........................................................................ 18

    III.   THE PLAN PAID UNREASONABLE RECORDKEEPING FEES AND THE PLAN'S FIDUCIARIES FAILED TO ENGAGE IN A PRUDENT PROCESS TO EVALUATE RECORDKEEPING FEES ................................... 20

        A.    Fidelity as a Recordkeeper....................................................... 20

        B.    The Plan's Recordkeeping Services Agreement with Fidelity Should Have Been Comparable to Similar Plans Fidelity Managed........................................................................... 21

        C.    The Plan's Recordkeeping Fees Were/Are Unreasonable When Benchmarked Against Other Similarly Situated Plans.................. 25

CLASS ALLEGATIONS ...........................................................................................29

CAUSES OF ACTION .............................................................................................31

PRAYER FOR RELIEF.............................................................................................34

JURY DEMAND .....................................................................................................35

Plaintiff Adam Fischer ("Plaintiff"), by and through his attorneys, on behalf of the American Airlines, Inc. 401(k) Plan (the "Plan"),[1] individually and on behalf of all others similarly situated, states and alleges as follows:

## NATURE OF THE ACTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include American Airlines, Inc. (the "Company") and John Does 1-10 (collectively, "Defendants"), for breaches of their fiduciary duties.

2. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

3. Defendants, as ERISA fiduciaries, exercise discretionary authority or discretionary control over the Plan. Part of this requires Defendants to execute care, skill, prudence, and diligence when choosing a third-party service provider (i.e., a "recordkeeper") to record keep and administer the plan, and to objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeping options.

4. Nearly all recordkeepers in the marketplace offer the same range of services and

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

2

can provide the services at very little cost.  Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as "RKA."

5.    Defendants failed to uphold their fiduciary duties when evaluating the RKA fees that plan participants, including Plaintiff, had to pay.  As shown in the chart below reflecting participant costs from comparable plans in 2023, the Plan's cost per participant is ***over triple the average fee of $8.32*** per participant for the nine other plans listed:

| Plan Name | Plan Year | Assets | Participants | Cost Per Participant[2] |
|---|---|---|---|---|
| Lowes 401(k) Plan | 2023 | $8,108,634,836 | 147,562 | $7.97 |
| Google, LLC 401(k) Plan | 2023 | $39,047,152,408 | 152,158 | $7.97 |
| IBM 401 (K) Plus Plan | 2023 | $57,428,456,306 | 154,910 | $1.23 |
| Microsoft Corporation Savings Plus 401K Plan | 2023 | $53,225,853,429 | 172,201 | $2.97 |
| Starbucks Corporation 401(k) Plan | 2023 | $4,096,838,458 | 161,998 | $15.19 |
| Kaiser Permanente 401(k) Retirement Plan | 2023 | $19,708,272,899 | 175,631 | $12.23 |
| TJX - TJX Companies 401(k) Savings Plan | 2023 | $3,180,545,680 | 125,614 | $12.99 |
| Salesforce 401(k) Plan | 2023 | $7,317,484,047 | 53,709 | $11.52 |
| Intel 401(k) Savings Plan | 2023 | $22,179,181,890 | 82,693 | $2.82 |
| American Airlines, Inc. 401(k) Plan | 2023 | $14,680,189,879 | 111,428 | $30.77 |

6.    The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent

---

[2] Cost-per-participant was calculated using the total recordkeeping fees reported in the Schedule H. If no recordkeeping fees were listed in the Schedule H, the calculation relied on the Schedule C, identifying fees paid to service providers with a service code of "15" and/or "64," which signify recordkeeping fees. *See* Instructions for Form 5500 (2023) at pg. 30 (defining each service code), available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2023-instructions.pdf.  That total reported amount was divided by the number of participants with account balances as of the end of the plan year.

process for selecting investment options and service providers."[3]

7.     With regard to plan fees, the DOL states: "You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan."[4]  It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan," *Tibble*, 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019).

8.     At all times during the Class Period, the Plan had at least $1 billion dollars in assets under management.  At the end of fiscal years 2022 and 2023, the Plan had over $12 billion dollars and $14 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.  The October 9, 2024 Independent Auditors' Report of the American Airlines, Inc. 401(k) Plan ("2024 Auditor Report")[5] at 4.

9.     The Plan is large in terms of the number of its participants. From December 31, 2022 to December 31, 2023, for example, the Plan had between 99,540 and 111,428 participants with account balances as of the end of the plan year.

10.     Plans with large numbers of participants—like the Plan here—can take advantage

---

[3] *See* U.S. DEP'T OF LABOR, *A Look at 401(k) Plan Fees*, available at https://www.dol.gov/node/63354#:~:text=401(k)%20plan%20fees%20and%20expenses%20gene rally%20fall%20into%20three,the%20plan%20as%20a%20whole (last accessed Aug. 17, 2025).

[4] *Id.*

[5] The 2024 Auditor Report "performed the audits of the financial statements of American Airlines, Inc. 401(k) Plan .... The financial statements comprise the statements of net assets available for benefits as of December 31, 2023 and 2022, and the related statement of changes in net assets available for benefits for the year ended December 31, 2023, and the related notes to the financial statements[.]" *Id.* at 1.

4

of economies of scale by negotiating a lower per-participant recordkeeping fee.

11.     Not only does the number of participants add to the negotiating power of the Plan, but the Plan's assets under management makes it a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2021, only 0.2% (1,011 of 641,747) of Plans in the country had more than $1 billion in assets under management.[6]  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendant, however, did not try to reduce the Plan's expenses to ensure they were prudent.

12.     Plaintiff alleges that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to control the Plan's administrative and recordkeeping ("RKA") costs paid to Fidelity, the Plan's recordkeeper.

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Defendants' actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     These objectively unreasonable RKA fees cannot be justified.  Prudent fiduciaries of 401(k) plans continuously monitor fees against applicable benchmarks and peer groups to identify objectively unreasonable and unjustifiable fees.  Defendants engaged in a flawed and imprudent decision-making and selection process by not subjecting its current recordkeeper to a

---

[6] *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2021*, (Aug. 2024), at 7, available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

competitive, recordkeeper bidding process during the Class Period, and continuing to monitor the market for RKA fees.

15.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence, and failure to monitor fiduciaries.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

17.     This Court has personal jurisdiction over Defendants because they transact business in this District and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

18.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.  Venue is further proper because Plaintiff participated in the Plan while working for Defendant at LaGuardia Airport in Queens, New York.

19.     In conformity with 29 U.S.C. §1132(h), Plaintiff has mailed the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

20.     **Plaintiff Adam Fischer ("Plaintiff")**, resides in Point Lookout, New York and has been employed by Defendant American Airlines Inc. for roughly ten (10) years a fleet service agent.  As a fleet agent, Plaintiff Fischer worked on the aircraft ramp, loading cargo, and ensuring

6

planes were ready for flight. During his employment, Plaintiff participated in the Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs.  Mr. Fischer suffered injury to his Plan account by overpaying for his share of RKA costs and losing out on investment.  Plaintiff participated in the Plan and had an account balance in the Plan from the time his employment began with American Airlines through the present.  Plaintiff worked for Defendant at LaGuardia Airport in Queens, New York.

21.    Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct.  Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, and what his account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.    Plaintiff did not have knowledge of all material facts (including, among other things, recordkeeping cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

23.    **Defendant American Airlines, Inc**.  American Airlines, Inc. (the "Company") is the sponsor and administrator of the Plan with a principal place of business at 1 Skyview Drive, Fort Worth, Texas 76155.[7]  American Airlines, Inc. is a major airline in the United States, and is one of the largest airlines in the world in terms of passengers carried and daily flights.

24.    The Company is the plan sponsor and administrator and ensures, among other things, that the investments available to the Plan's participants are appropriate, had no more

---

[7] The December 31, 2023 Form 5500 of the Plan filed with the United States Department of Labor ("2023 Form 5500"), at 1-2.

expense than reasonable, performed well as compared to their peers, and/or paid a reasonable rate for recordkeeping given the size of the Plan.  As will be discussed below, the Company fell well short of these fiduciary goals.  Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Accordingly, the Company during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

26.     **Additional John Doe Defendants**.  To the extent that there are additional officers, employees and/or contractors of American Airlines, Inc. who are/were fiduciaries of the Plan during the Class Period, or were hired as investment manager(s) for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-10 include, but are not limited to, American Airlines, Inc. officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

**CLASS ALLEGATIONS**

**I.      THE PLAN**

27.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34)[8] in that the Plan provides for an individual account for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan is based solely on the amounts allocated to each individual's account.

---

[8] 2024 Auditor Report at 6.

28. **Eligibility**. In general, "[e]mployees are eligible to participate in the Plan as soon as administratively possible following the employee's hire date."[9]

29. **Contributions**. Participants "may elect to allow the employer to deduct from the participant's eligible compensation contributions to the Plan on a before-tax, Roth or after-tax basis. Such contributions are subject to certain limitations in accordance with provisions of the Code."[10]

30. With regard to matching contributions made by the Company, "certain participants receive employer contributions." Employer contributions vary:

- MSS and CWA-IBT participants receive a 100% company match on their before-tax and/or Roth contributions up to 5.5% of their eligible compensation;

- Flight attendant participants receive non-elective employer contributions of 3% of eligible compensation plus 100% company matching contributions on their before-tax and/or Roth contributions of up to 2.5% of eligible compensation;

- International Association of Machinists and Aerospace Workers ("IAM") designated employees represented by the TWU-IAM receive 100% company matching contributions of up to 4% of eligible compensation; and

- For pay received through January 13, 2023, Dispatch participants received 100% company matching contributions of up to 5.5% of their eligible compensation. From January 14, 2023 to December 31, 2023, Dispatch participants received non-elective employer contributions of 9% of eligible compensation. ... For pay received on or after January 1, 2024, Dispatch participants will receive non-elective employer contributions of 5% of eligible compensation plus 100% company matching contributions of up to 4% of eligible compensation.[11]

31. Like other companies that sponsor 401(k) plans for their employees, the Company enjoys both direct and indirect benefits by providing matching contributions to the Plan

---

[9] *Id.*
[10] *Id.*

[11] *Id.* at 7.

participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.[12]

32.    The Company also benefits in other ways from the Plan's matching program.  It is well-known that offering retirement plans can help in employers' efforts to attract new employees and reduce turnover.[13]

33.    Given the size of the Plan, the Company likely enjoyed a significant tax and cost savings from offering a match.

34.    **Vesting**.  "Participants are immediately vested in their participant contributions plus earnings thereon. The Plan requires participants to be employed for two years before becoming 100% vested in company contributions, plus earnings thereon. Accounts that are voluntarily transferred into the Plan from a plan sponsored by a related employer are subject to the vesting rules in effect under the prior plan but will otherwise be subject to the terms of the Plan."[14]

35.    **The Plan's Investments**.  The Plan's net assets available for benefits as of December 31, 2023 was $14,708,014,000.[15]

36.    **Payment of Plan Expenses**.  During the Class Period, administrative expenses, including recordkeeping fees, were paid for using the Plan's assets.[16]

---

[12] *See generally* IRS, *401(k) Plan Overview*, available at https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

[13] *See, e.g.*, STARGARDEN, *Retirement Savings Plans Can Boost Employee Retention* (Aug. 13, 2024), available at https://blog.stargarden.com/test/retirement-savings-plans-can-boost-employee-retention-0 ("Recent studies emphasize the importance of retirement benefits in employee retention. According to a 2022 Global Benefits Attitudes Survey by WTW, nearly 60% of employees cited their employers' retirement benefits as a significant reason they remain with their current employer, compared to 41% in 2010[.]") (citation omitted).

[14] 2024 Auditor Report at 8.

[15] *Id.* at 4.

[16] *Id.* at 9 ("Administrative expenses, including recordkeeping and maintenance fees, are paid by the Plan through direct participant account allocations.").

37.     **The Plan's RKAs**. As discussed in depth below, ERISA fiduciaries are required to obtain information from various recordkeepers and compare the market to ensure plan participants are paying reasonable RKAs. However, Defendants did not do so.

38.     From information obtained through the DOL, Plaintiff has gleaned a historical snapshot of the RKA rates for the Plan, as well as other plans of similar size and scope:

| Plan Name | Plan Year | Assets | Participants | Cost Per Participant[17] |
|---|---|---|---|---|
| Lowes 401(k) Plan | 2022 | $7,355,936,526 | 149,935 | $8.81 |
| Google, LLC 401(k) Plan | 2022 | $28,898,202,210 | 148,787 | $14.45 |
| IBM 401 (K) Plus Plan | 2022 | $53,363,875,208 | 162,870 | $12.49 |
| Microsoft Corporation Savings Plus 401K Plan | 2022 | $39,602,667,639 | 166,621 | $5.53 |
| Starbucks Corporation 401(k) Plan | 2022 | $3,240,772,984 | 152,890 | $15.74 |
| Kaiser Permanente 401(k) Retirement Plan | 2022 | $16,058,823,184 | 159,120 | $10.52 |
| TJX Companies 401(k) Savings Plan | N/A | 2022 Form 5500 not available on DOL Form 5500 Search | | |
| Salesforce 401(k) Plan | 2022 | $5,696,765,553 | 55,168 | $25.02 |
| Intel 401(k) Savings Plan | 2022 | $18,361,585,903 | 84,543 | $2.32 |
| American Airlines, Inc. 401(k) Plan | 2022 | $12,806,443,202 | 99,540 | $32.26 |
| Lowes 401(k) Plan | 2021 | $9,466,550,339 | 158,184 | $9.26 |
| Google, LLC 401(k) Plan | 2021 | $30,556,649,022 | 124,725 | $16.48 |
| IBM 401 (K) Plus Plan | 2021 | $67,554,919,021 | 166,735 | $20.45 |
| Microsoft Corporation Savings Plus 401K Plan | 2021 | $48,020,791,784 | 148,956 | $6.81 |
| Starbucks Corporation 401(k) Plan | 2021 | $3,676,701,817 | 143,162 | $14.09 |
| Kaiser Permanente 401(k) Retirement Plan | 2021 | $18,614,838,105 | 149,636 | $12.07 |
| TJX Companies 401(k) Savings Plan | N/A | 2021 Form 5500 not available on DOL Form 5500 Search | | |
| Salesforce 401(k) Plan | 2021 | $6,089,494,511 | 49,396 | $24.67 |
| Intel 401(k) Savings Plan | 2021 | $21,524,243,697 | 78,265 | $2.16 |
| American Airlines, Inc. 401(k) Plan | 2021 | $15,478,674,868 | 105,557 | $34.19 |

39.     The Plan's recordkeeping fee continued to exceed, by far, the reasonable rate for a

---

[17] Cost-per-participant was calculated using the method described *supra* note 2.

plan of its size:

| Year | Participants ("PP") | Fidelity Per Participant Charge ("PPC") | Total Direct Costs (PP x PPC) |
|---|---|---|---|
| 2023 | 111,428 | $30.77 | $3,429,207 |
| 2022 | 99,540 | $32.26 | $3,211,492 |
| 2021 | 105,557 | $34.19 | $3,609,272 |
| 2020 | 103,613 | $39.38 | $4,080,884 |
| 2019 | 101,967 | $41.69 | $4,251,845 |

40. This is especially concerning given the fact that "a high fee may reflect imprudence even if the fee *falls* year-over-year." *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 2:20-cv-01493, 2021 WL 3417843, *4 (W.D. Pa. Aug. 3, 2021) (emphasis added). After all, continuously paying excessive fees without trying to negotiate lower fees or periodically benchmarking against the market is a breach of fiduciary duty, regardless of fee consistency over time.

41. As discussed *infra*, these charts exemplify Defendants' failure to uphold their duty to Plaintiff and the Plan as these fees are unreasonable.

## II. DEFENDANTS FAILED TO UPHOLD THEIR FIDUCIARY DUTIES REGARDING THE RKAs

42. As described above, Defendants were fiduciaries of the Plan.

43. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 143 n.10 (1985)).

44. "The duty to pay only reasonable fees for plan services and to act solely in the best

interest of participants has been a key tenet of ERISA since its passage."[18]

**A.      Costs for Recordkeeping Services Vary Little for a Plan with a Substantial Number of Participants Like the Plan Here**

45.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's recordkeeper.

46.     Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order ("QDRO") processing, and loan processing are often a profit center for recordkeepers. Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

47.     There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

- Basic account recordkeeping (*e.g.*, demographic, source, investment and vesting records);
- Multi-channel participant and plan sponsor access (*e.g.*, phone, web);
- Daily participant transaction accounting (*e.g.*, purchases, redemptions, exchanges);
- Payroll service (*e.g.*, hardships, in-service withdrawals, termination distributions);
- Participant tax reporting services (*e.g.*, IRS Form 1099-R);
- Participant confirmations, statements, and standard notices;

---

[18] VANGUARD, *Best practices for plan fiduciaries,* at 36, available at https://web.archive.org/web/20220120144939/https://institutional.vanguard.com/iam/pdf/FBPBK.pdf; *see also* VANGUARD, *Fiduciary tool kit for financial professionals*, https://institutional.vanguard.com/content/dam/inst/iig-transformation/offers/vrpa/pdf/fiduciary-toolkit-for-financial-professionals.pdf, at 7 ("Does your organization ... Assess whether plan fees are reasonable?").

- Plan-level reporting and annual financial package (excluding IRS Form 5500);

- Participant education (*e.g.*, newsletters, web articles, standard communication materials); and

- Plan consulting (*e.g.*, preapproved document services, operational materials).

48.     These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services.

49.     The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.  Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).  These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.

50.     The way it works, in part, is that each participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions and participant reports. Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns.  In this manner, a participant's account is somewhat similar to a simplified brokerage account with only a few investment positions.  As a result, the cost of recordkeeping a participant's account with a balance of, for example, $500,000 is the same as for a participant whose account balances is $5,000 in the same plan.

51.     Recordkeepers for relatively larger defined contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the

14

number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans.

52.    The cost of providing recordkeeping services thus often depends on the number of participants in a plan.

53.    The market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like Defendants' with large numbers of participants and large amounts of assets.

54.    When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost.  As a result, the cost to add a new participant to a plan is relatively low.  And as the overall number of participants increase, the average cost per participant decreases.  *See* DOL Study of 401(k) Plan Fees and Expenses (1998), at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.").[19]

55.    Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.  The actual cost of administrative services is more dependent on the number of participants in the plan.  There is no logical or practical correlation between an increase in administrative fees and an increase in plan assets.[20]

---

[19] Available at https://www.dol.gov/sites/dolgov/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[20] "Fees, measured as a percentage of assets, tend to decline as account balances and number of participants increase." DELOITTE, *Defined Contribution / 401(k) Fee Study*, at 8, available at https://www.ici.org/doc-server/pdf%3Arpt_09_dc_401k_fee_study.pdf; *see also* MERCER INVESTMENT CONSULTING, INC., *DC Fee Management – Mitigating Fiduciary Risk and*

56. Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

57. Although the 401(k)-participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

58. Recordkeeping and annual account administration add no monetary value to the account and act solely as a necessary expense decreasing investment returns. There is no rational economic reason for the recordkeeper, or account administrator, to receive increased revenues simply based upon increased investment returns, and increased account balances, or employee additional retirement savings' contributions.

59. During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per participant fee when evaluated on a per participant basis.

**B.      ERISA's Fee Disclosure Rule**

60. In 2012, the DOL published a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the

---

*Maximizing Plan Performance* (2013), at 5, available at https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Ma nagement%20- %20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf ("[A] per-participant fee is considered best practice and is in line with how recordkeeping costs are generated").

16

"408(b)(2) Regulation."[21]

61.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services.  The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

62.     As stated by the DOL: ERISA "require[s] plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."[22]

63.     The 408(b)(2) disclosures, in short, require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

64.     Plan sponsors, as ERISA fiduciaries, should obtain this information from various recordkeepers and compare the market to ensure plan participants are paying reasonable RKAs. However, Defendants did not do so.

65.     A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

---

[21] *See* U.S. D.O.L., *Fact Sheet, Proposed Regulation to Require a Guide to Assist Plan Fiduciaries in Reviewing 408(b)(2) Disclosures* (Mar. 2014), available at https://www.sparkinstitute.org/content-files/408b2_guide_fact_sheet_3-11-14.pdf ("DOL 408(b)(2) Regulation Fact Sheet").

[22] *Id.* at 1.

66.    Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants.  Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)."  29 CFR § 2550.404a-5(C)(2)(ii)(B).

**C.    Much Information Regarding the Reasonableness of Fees for Recordkeeping Services is in the Sole Possession of Defendant**

67.    As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants.  The same is true for Plaintiff and this Plan, as Plaintiff does not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

68.    Other information has also not been made available to Plaintiff.

69.    For example, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.  *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (401(k) excessive fee case which reversed the district court's grant of summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'—i.e., a bid from another service provider—[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount

for the services provided.'") (internal citation omitted); *see also Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

70.    Cerulli Associates[23] stated in early 2012 that more than half of the plan sponsors asked indicated that they "'are likely to conduct a search for [a] recordkeeper within the next two years.'"  These RFPs were conducted even though many of the plan sponsors indicated that they "'have no intention of leaving their current recordkeeper.'"[24]

71.    Generally, any RFPs, if conducted, would not be made available to plan participants.  The same is true for Plaintiff here who does not have direct access to such information.

72.    Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of meeting minutes.  These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions. Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized. Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

73.    In short, Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes

---

[23] "Since 1992, [Cerulli] ha[s] powered financial services firms with in-depth analysis and strategic recommendations." CERULLI ASSOCIATES, https://www.cerulli.com/.

[24] *Recordkeeper Search Activity Expected to Increase Within Next Two Years*, CERULLI ASSOCIATES (Jan. 8, 2013), available at https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/ (internal quotation omitted).

(and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Walmart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

74.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiff, such as Form 5500s filed with the DOL.  By analyzing comparable plans to the Plan, it is clear Defendants did not do their due diligence in choosing a Plan and/or negotiating for reasonable RKA fees.  Nor did Defendants do their due diligence in renegotiating the Plan's fees as years went on.

75.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plan and the assets of participants.

## III.    THE PLAN PAID UNREASONABLE RECORDKEEPING FEES AND THE PLAN'S FIDUCIARIES FAILED TO ENGAGE IN A PRUDENT PROCESS TO EVALUATE RECORDKEEPING FEES

### A.    Fidelity as a Recordkeeper

76.     Defendants appointed Fidelity as the recordkeeper to assist with administering the Plan (the "Recordkeeper" or "Fidelity").[25]

77.     During the Class Period, Fidelity was the top recordkeeper nationally as measured by assets being recordkept.  According to Summit Consulting Group, which provides "the most current, publicly available snapshot," Fidelity is ranked first:

---

[25] *See* 2024 Auditor's Report, at 6; *see also* 2023 Form 5550 at Schedule C.

TOP PROVIDERS (RECORDKEEPERS)[26]

| Rank | Provider Name | Total 401(k) Assets ($MM) | Market Share (%) | Key Plan Types Served |
|------|---------------|---------------------------|------------------|------------------------|
| 1 | Fidelity Investments | 2,037,733 | 43.7% | Corporate 401(k), 403(b) |
| 2 | Empower Retirement | 493,577 | 10.6% | Corporate 401(k), 457(b) |
| 3 | Vanguard Group | 454,223 | 9.7% | Corporate 401(k), 403(b) |
| 4 | Alight Solutions | 434,737 | 9.3% | Corporate 401(k), non-profit plans |
| 5 | Principal Financial Group | 322,976 | 6.9% | Corporate 401(k), 401(a), 403(b) |

78.    The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena.

**B.    The Plan's Recordkeeping Services Agreement with Fidelity Should Have Been Comparable to Similar Plans Fidelity Managed**

79.    As noted above, 408(b)(2) disclosures are not available to plan participants.  By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either.  Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct an RFP.

80.    Prudent plan fiduciaries ensure they are paying only reasonable fees for RKA services by soliciting competitive bids from other recordkeepers to perform the same services currently being provided to the plan.  This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries.  Plan fiduciaries need only request a bid from salespeople at

---

[26] *Largest 401k Providers: Top 10 by Assets and Participants*, SUMMIT CONSULTING GROUP (May 1, 2025), https://www.geauxsummit401k.com/largest-401k-providers/.

21

other service providers. For plans with as many participants as the Plan, most recordkeepers would require only the number of participants and the amount of the assets to provide a quote while others might only require the number of participants.

81. Prudent plan fiduciaries have all of this information readily available and can easily receive a quote from other service providers to determine if the current level of fees is reasonable. Prudent plan fiduciaries should also inquire with its current recordkeeper regarding its other plans it administers and the costs those plan participants pay in fees.

82. Having received bids, the prudent plan fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services.

83. Here, it appears that Defendants failed to conduct an RFP in the years leading up to the start of the putative Class Period. The fact that the Plan had the same recordkeeper in place, Fidelity, since at least 2016 with little meaningful change in the already excessive RKA rate strongly suggests that the Plan fiduciaries failed to act in the best interests of Plan participants when they failed to genuinely attempt to seek a competitive market rate for RKA fees, especially when the number of participants increased. Had Defendants genuinely sought a competitive rate, the Plan participants would have benefited from a significant reduction in RKA costs given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

84. At any point in the Class Period, the Plan's fiduciaries could have opted to conduct an RFP to any recordkeeper including any of the above top ten recordkeepers who were peers of Fidelity and capable of providing lower recordkeeping fees. Had Defendants sought an appropriate market rate through an RFP, it's likely either the recordkeeper would have been

22

changed at some point or Fidelity would have agreed to pay its own admitted reasonable rate of $14-$21 per participant or less (as discussed *infra*) throughout the Class Period.

85. Apart from failing to reduce the Plan's recordkeeping fees through an RFP, the evidence also indicates the Plan's fiduciaries failed to leverage the Plan's massive size to negotiate lower recordkeeping fees.

86. If the recordkeeping fee is paid by Plan Participants, the Plan Fiduciary can allocate the negotiated recordkeeping fee among participant accounts at the negotiated per-participant rate, or pro-rata based on account values, among other less common ways. In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the Plan.

87. Regardless of the pricing structure negotiated by the plan fiduciary, the fiduciary must ensure that the fee paid to the recordkeeper for RKA services is reasonable for the level of services provided. Defendants failed to use their leverage as a jumbo plan with over $14 billion in assets and over 100,000 participants to negotiate reasonable RKA fees.

88. What Defendants knew, or should have known, was that Fidelity charges, and has charged, lower recordkeeping fees to other plans, ***much smaller in size to the Plan*** in terms of the number of participants (and thus plans with less bargaining power than the Plan), for the same routine recordkeeping services it offered to the Plan.

89. Moreover, in a recent lawsuit, where Fidelity's own multi-billion dollar plan (with "more than 58,000 participants") was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in

assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F. Supp. 3d 189, 199, 214 (D. Mass. 2020) (internal citations omitted).

90.    The significance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics.  The Plan here had nearly double the number of participants than the Fidelity plan had (meaning the Plan should have commanded lower fees) and was also a billion-dollar plan like the Fidelity plan.

91.    Looking at just a couple retirement plans recordkept by Fidelity during even half the span of the Class Period further demonstrates that plans with over a billion dollars in assets under management, and having over 10,000 plan participants (the last tranche in the 2021 BrightScope ICI study), were ***able to obtain recordkeeping fees from Fidelity that were below the fees of the Plan even though the Plan had a greater bargaining advantage with its immense size*** than all the other plans and should have been able to command much lower recordkeeping fees:

| Plan Name | Plan Year | Assets | Participants | Cost Per Participant[27] |
|---|---|---|---|---|
| Salesforce 401(k) Plan | 2023 | $7,317,484,047 | 53,709 | $11.52 |
| Salesforce 401(k) Plan | 2022 | $5,696,765,553 | 55,168 | $25.02 |
| Salesforce 401(k) Plan | 2021 | $6,089,494,511 | 49,396 | $24.67 |
| Publicis Benefits Connection 401(k) Plan | 2023 | $4,443,860,760 | 50,628 | $18.32 |
| Publicis Benefits Connection 401(k) Plan | 2022 | $3,568,294,485 | 50,628 | $24.21 |
| Publicis Benefits Connection 401(k) Plan | 2021 | $4,306,524,466 | 48,148 | $27.06 |
| Intel 401(K) Savings Plan | 2023 | $22,179,181,890 | 82,693 | $2.82 |
| Intel 401(K) Savings Plan | 2022 | $18,361,585,903 | 84,543 | $2.32 |
| Intel 401(K) Savings Plan | 2021 | $21,524,243,697 | 78,265 | $2.16 |
| American Airlines, Inc. 401(k) Plan | 2023 | $14,680,189,879 | 111,428 | $30.78 |
| American Airlines, Inc. 401(k) Plan | 2022 | $12,806,443,202 | 99,540 | $32.26 |
| American Airlines, Inc. 401(k) Plan | 2021 | $15,478,674,868 | 105,557 | $34.19 |

92.    Based on this table—in addition to the tables *supra* ¶¶ 38-39—the Plan in 2023 should have been able to obtain per participant recordkeeping fees of at *least* $3-$19 per participant

---

[27] Cost-per-participant was calculated using the method described *supra* note 2.

from Fidelity based on its immense size and the routine nature of the recordkeeping services performed by Fidelity. As noted above, Fidelity largely offers the same services to its 401(k) clients.[28]

93.     However, the Plan's rates continued to exceed, by far, the reasonable rate for a plan of that size:

| Year | Participants ("PP") | Fidelity Per Participant Charge ("PPC") | Total Direct Costs (PP x PPC) |
|---|---|---|---|
| 2023 | 111,428 | $30.77 | $3,429,207 |
| 2022 | 99,540 | $32.26 | $3,211,492 |
| 2021 | 105,557 | $34.19 | $3,609,272 |
| 2020 | 103,613 | $39.38 | $4,080,884 |
| 2019 | 101,967 | $41.69 | $4,251,845 |

94.     Again, the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service for a *much lower* cost—including Fidelity itself—as explained below.

95.     In 2023, the Plan's Form 5500 filed with the DOL reported direct recordkeeping compensation to Fidelity in the amount of $3,429,207 stated above (*i.e.* "Total Direct Costs").

C.      **The Plan's Recordkeeping Fees Were/Are Unreasonable When Benchmarked Against Other Similarly Situated Plans**

96.     At all times during the Class Period, the above fees were unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size

---

[28] The chart also includes the Salesforce 401(k) Plan and Intel 401(k) Savings Plan, which have *less than* 100,000 participants, but were still able to command a lower cost per participant charge, further tipping in Plaintiff's favor. *See also supra* ¶¶ 5, 38 (charts also containing these two plans).

increases."[29]  Accordingly, the larger the plan, the lower the recordkeeping fee should be.

97.    To put things into perspective, when comparing retirement plan data, most publications utilize tranches.  For example, the leading publication that collects 401(k) data is "BrightScope/ICI."[30]  BrightScope categorizes plans in the following tranches:

EXHIBIT I.2

**Universe of 401(k) Plans**

Distribution of 401(k) plans, participants, and assets by plan assets or number of plan participants, 2021

| | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| **Plan assets** | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Less than $1M | 345,145 | 53.8% | 5,625.2 | 7.4% | $102.1 | 1.3% |
| $1M to $10M | 245,638 | 38.3 | 13,438.8 | 17.6 | 787.4 | 10.0 |
| >$10M to $50M | 39,083 | 6.1 | 10,038.7 | 13.2 | 792.1 | 10.1 |
| >$50M to $100M | 5,195 | 0.8 | 4,480.3 | 5.9 | 363.4 | 4.6 |
| >$100M to $250M | 3,431 | 0.5 | 6,615.9 | 8.7 | 528.5 | 6.7 |
| >$250M to $500M | 1,390 | 0.2 | 5,437.4 | 7.1 | 485.4 | 6.2 |
| >$500M to $1B | 854 | 0.1 | 5,448.2 | 7.2 | 600.3 | 7.6 |
| More than $1B | 1,011 | 0.2 | 25,061.2 | 32.9 | 4,209.8 | 53.5 |
| All plans | 641,747 | 100.0 | 76,145.7 | 100.0 | 7,869.0 | 100.0 |

| | Plans | | Participants | | Assets | |
|---|---|---|---|---|---|---|
| **Number of plan participants** | Number | Percent | Thousands | Percent | Billions of dollars | Percent |
| Fewer than 100 | 575,252 | 89.6% | 12,043.9 | 15.8% | $1,041.1 | 13.2% |
| 100 to 499 | 52,175 | 8.1 | 10,156.2 | 13.3 | 839.6 | 10.7 |
| 500 to 999 | 6,597 | 1.0 | 4,592.5 | 6.0 | 416.2 | 5.3 |
| 1,000 to 4,999 | 5,989 | 0.9 | 12,405.4 | 16.3 | 1,358.0 | 17.3 |
| 5,000 to 9,999 | 890 | 0.1 | 6,205.8 | 8.1 | 784.2 | 10.0 |
| 10,000 or more | 844 | 0.1 | 30,741.8 | 40.4 | 3,429.9 | 43.6 |
| All plans | 641,747 | 100.0 | 76,145.7 | 100.0 | 7,869.0 | 100.0 |

Note: Assets are fair market value at the year-end of the plan and include loans. The results exclude 403(b) plans with a 401(k) feature.

Source: BrightScope Defined Contribution Plan Database

98.    Accordingly, the billion-dollar asset mark is significant as all plans over a billion dollars are considered in a category of their own, as there are only 0.2% of plans in this category as of 2021. This exemplifies Defendants' market power and leverage in negotiating with recordkeepers.

---

[29] *Supra* ¶ 54.

[30] *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2021*, (Aug. 2024), at 7, available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

99.     The below chart depicting RKAs from 2023, the most recent year for which most plan Form 5500s are available,[31] demonstrates the unreasonably high Plan fees compared to the Plan's peers:

| Plan Name | Plan Year | Assets | Participants | Cost Per Participant[32] |
|---|---|---|---|---|
| Lowes 401(k) Plan | 2023 | $8,108,634,836 | 147,562 | $7.97 |
| Google, LLC 401(k) Plan | 2023 | $39,047,152,408 | 152,158 | $7.97 |
| IBM 401 (K) Plus Plan | 2023 | $57,428,456,306 | 154,910 | $1.23 |
| Microsoft Corporation Savings Plus 401K Plan | 2023 | $53,225,853,429 | 172,201 | $2.97 |
| Starbucks Corporation 401(k) Plan | 2023 | $4,096,838,458 | 161,998 | $15.19 |
| Kaiser Permanente 401(k) Retirement Plan | 2023 | $19,708,272,899 | 175,631 | $12.23 |
| TJX Companies 401(k) Savings Plan | 2023 | $3,180,545,680 | 125,614 | $12.99 |
| Salesforce 401(k) Plan | 2023 | $7,317,484,047 | 53,709 | $11.52 |
| Intel 401(k) Savings Plan | 2023 | $22,179,181,890 | 82,693 | $2.82 |
| American Airlines, Inc. 401(k) Plan | 2023 | $14,680,189,879 | 111,428 | $30.77 |

100.    The above chart demonstrates that for plans with more than a billion dollars and 100,000[33] participants, the Plan had one of the highest recordkeeping fees by a wide margin. As noted above, as of the end of 2023 there were only 66 401(k) plans with 100,000 or more participants.[34] ***The Plan's $30.77 per participant fee is over triple the average fee of $8.32*** per participant for the nine other plans listed above. This vast discrepancy between the Plan's recordkeeping fees existed for all years of the Class Period:

---

[31] At the time of drafting this Complaint, the most recent American Airlines, Inc. 401(k) Plan available through the DOL's Form 5500 search was for the Plan Year 2023.

[32] *See supra* note 2.

[33] The chart also includes the Salesforce 401(k) Plan and Intel 401(k) Savings Plan, which have significantly *fewer than* 100,000 participants, but were still able to command a lower cost per participant charge, further tipping in Plaintiff's favor.

[34] This number was calculated using the DOL Form 5500 Search available at https://www.efast.dol.gov/5500Search/, searching "401k," and filtering the results by participants and year.

| Plan Name | Plan Year | Assets | Participants | Cost Per Participant[35] |
|---|---|---|---|---|
| Lowes 401(k) Plan | 2022 | $7,355,936,526 | 149,935 | $8.81 |
| Google, LLC 401(k) Plan | 2022 | $28,898,202,210 | 148,787 | $14.45 |
| IBM 401 (K) Plus Plan | 2022 | $53,363,875,208 | 162,870 | $12.49 |
| Microsoft Corporation Savings Plus 401K Plan | 2022 | $39,602,667,639 | 166,621 | $5.53 |
| Starbucks Corporation 401(k) Plan | 2022 | $3,240,772,984 | 152,890 | $15.74 |
| Kaiser Permanente 401(k) Retirement Plan | 2022 | $16,058,823,184 | 159,120 | $10.52 |
| TJX Companies 401(k) Savings Plan | 2022 Form 5500 not available on DOL Form 5500 Search | | | |
| Salesforce 401(k) Plan | 2022 | $5,696,765,553 | 55,168 | $25.02 |
| Intel 401(k) Savings Plan | 2022 | $18,361,585,903 | 84,543 | $2.32 |
| American Airlines, Inc. 401(k) Plan | 2022 | $12,806,443,202 | 99,540 | $32.26 |
| Lowes 401(k) Plan | 2021 | $9,466,550,339 | 158,184 | $9.26 |
| Google, LLC 401(k) Plan | 2021 | $30,556,649,022 | 124,725 | $16.48 |
| IBM 401 (K) Plus Plan | 2021 | $67,554,919,021 | 166,735 | $20.45 |
| Microsoft Corporation Savings Plus 401K Plan | 2021 | $48,020,791,784 | 148,956 | $6.81 |
| Starbucks Corporation 401(k) Plan | 2021 | $3,676,701,817 | 143,162 | $14.09 |
| Kaiser Permanente 401(k) Retirement Plan | 2021 | $18,614,838,105 | 149,636 | $12.07 |
| TJX Companies 401(k) Savings Plan | 2021 Form 5500 not available on DOL Form 5500 Search | | | |
| Salesforce 401(k) Plan | 2021 | $6,089,494,511 | 49,396 | $24.67 |
| Intel 401(k) Savings Plan | 2021 | $21,524,243,697 | 78,265 | $2.16 |
| American Airlines, Inc. 401(k) Plan | 2021 | $15,478,674,868 | 105,557 | $34.19 |

101.    Indeed, Plaintiff Fischer's 2023 quarterly Account Summary from April 2025 to end of June 2025 shows that Plaintiff was charged 9.25 in "Fees." This approximates $37.00 per year in fees in 2025 alone.

102.    Dating back to 2019, the Plan's recordkeeping fees remained among the highest for billion-dollar plans while consistently having some of the largest numbers of Plan participants, an aspect of the Plan that should have commanded much lower fees. As a point of emphasis, in 2023,

---

[35] *See supra* note 2.

there were only 217 defined contribution plans in the country with over 50,000 participants,[36] and in 2021, there were only 844 with 10,000 participants or more,[37] meaning the Plan fiduciaries had tremendous bargaining power.

## CLASS ALLEGATIONS

103.    Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23.  Plaintiff seeks to represent a class defined as all persons, except Defendants and its immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 19, 2019 through the date of judgment (the "Class").

104.    **Numerosity:** The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 111,428 Plan "participants with account balances as of the end of the plan year."

105.    **Commonality:** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    A.  Whether Defendants are/were fiduciaries of the Plan;
    B.  Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;
    C.  Whether Defendants failed to adequately monitor any other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
    D.  The proper form of equitable and injunctive relief; and
    E.  The proper measure of monetary relief.

106.    **Typicality:**  Plaintiff's claims are typical of the claims of the members of the Class.

---

[36] This is a conservative figure using the DOL search tool. The most relevant number—participants *with account balances* as of the end of the plan year—is likely substantially lower than 217.

[37] *Supra* ¶ 97.

Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

107. **Adequacy:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

108. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

//

## CAUSES OF ACTION
### COUNT I
**Breach of Fiduciary Duty of Prudence**

109.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.  Plaintiff brings this cause of action on behalf of himself and members of the Class against Defendant.

110.    At all relevant times, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

111.    As fiduciary of the Plan, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

112.    Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  Defendants also failed to control the costs of the Plan's recordkeeping and administrative costs.

113.    During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RKA fees paid to covered service provider Fidelity.

114.    During the Class Period, Defendants failed to regularly monitor the Plan's RKA fees paid to covered service provider Fidelity.

115.    During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not

31

limited to Fidelity, in order to avoid paying objectively unreasonable fees for RKA services. Defendants failed to do so.

116. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not have process in place to ensure that the Plan paid no more than a competitive reasonable fee for RKA services. Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for RKA services.

117. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RKA services.

118. During the Class Period and because Defendants failed to regularly monitor the Plan's RKA fees paid to covered service providers, including but not limited to Fidelity, the Plan's RKA service fees were significantly higher than they would have been had Defendants engaged in this process.

119. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement and investment.

120. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan and participants all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in his Prayer for Relief.

//

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries

121.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.  Plaintiff brings this cause of action on behalf of himself and members of the Class against Defendant.

122.    Defendants had the authority to appoint and remove members or individuals responsible for the Plan's RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

123.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RKA fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

124.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

125.    Defendants breached its fiduciary duties by, *inter alia*:

    i.   Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RKA expenses;

    ii.  Failing to monitor the process by which Plan recordkeepers were evaluated and failing to investigate through competitive bidding the availability of lower-cost recordkeepers; and

    iii. Failing to remove individuals responsible for Plan RKA fees whose performance was inadequate in that these individuals continued to

33

pay the same RKA costs even though benchmarking and using other similar comparators would have showed that maintaining Fidelity as record keeper was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

126.    As the consequences of the foregoing breaches of the duty to monitor for RKA fees the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

127.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by its failure to adequately monitor individuals responsible for Plan RKA fees.  In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, individually and on behalf of all other similarly situated Plan participants and beneficiaries, seeks judgment against Defendants, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c) A Declaration that Defendants have breached their fiduciary duties under ERISA;

(d) An Order compelling Defendants to make good to the Plan losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

(e) An order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

(f) Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

(g) An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

(h) Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

(i) An award of pre-judgment interest;

(j) An award of costs pursuant to 29 U.S.C. § 1132(g);

(k) An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

(l) Such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: September 19, 2025        Respectfully submitted,

By: */s/ Yitzchak Kopel*
     Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Caroline C. Donovan
1330 Avenue of the America, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
       cdonovan@bursor.com

*Attorneys for Plaintiff*